# THE UNITED STATES OF AMERICA, EX REL. DE YTURBIDE,

*v.*

# THE METROPOLITAN CLUB OF THE CITY OF WASHINGTON.

PRACTICE; VERDICT; PRAYERS FOR INSTRUCTION; CORPORATIONS; BY-LAWS; AMOTION.

1. Under the statute of 9 Anne, Ch. 20, Sec. 2, which is in force in this District, the verdict of the jury is conclusive as to all matters of fact involved in a trial.

2. Prayers for instruction to the jury which conclude with a direction to find a verdict for the party offering them, must include every fact and circumstance in evidence that might justify an adverse conclusion, and make it clear that upon the evidence thus presented the adverse party has no right to a verdict in his favor.

3. A social club incorporated under the general incorporation laws of this District has the power after trial to expel one of its members for an offence against its by-laws, and if the trial is regularly conducted and the judgment of expulsion arrived at in good faith, there is no power or jurisdiction in the courts to reverse or vacate that judgment.

4. When a by-law of such a club subjects a member to expulsion for conduct unbecoming a gentleman, upon a two-thirds vote of the board of governors, it is a question which can only be determined by the corporate authorities whether the conduct of a member in accusing the daughter of a fellow-member, within the club and to members thereof, of writing anonymous letters, is a violation of the by-law.

5. Until the determination of the corporate authorities in such a case is successfully impeached, it will be presumed to have been fairly and *bona fide* made.

No. 652.   Submitted April 6, 1897.   Decided June 9, 1897.

HEARING on an appeal by the relator from a judgment on a verdict upon a petition for a writ of *mandamus.*   *Affirmed.*

## STATEMENT OF THE CASE.

This was an application for a *mandamus* by the appellant, Agustin de Yturbide, as relator, against the Metropolitan Club of the City of Washington, to compel the club to reinstate the relator to membership of the club, from which he had been expelled.

To the rule to show cause the appellee answered, and the answer was traversed by the relator, and issue was joined. The case was tried before a jury, as provided by the statute, and a verdict was rendered in favor of the respondent. A bill of exception was taken to certain rulings of the court made in the course of the trial, and the case is brought here for review of those rulings.

At the trial the following prayers for instruction to the jury were offered in behalf of the relator, all of which were refused, and exception duly noted:

1. If the jury believe from the evidence that there was no specification of charges in the summons to the board sent to the relator on April 23d, 1896, their verdict should be for the relator.

2. If the jury believe from the evidence that the relator did not have a full, fair, and impartial hearing before the board of governors at the meeting before which he appeared, then their verdict should be for the relator.

3. If the jury believe from the evidence that the relator was forced to leave the board room on April 25th, 1896, before he had finished his justification or defense, then their verdict should be for the relator.

4. If the jury believe from the evidence that the hearing

of the relator before the board of governors on the 25th day of April, 1896, was not held by the board with all the solemnity of a trial, then their verdict should be for the relator.

5. If the hearing of the relator before the board of governors on the 25th day of April was not held by the board with all the formality of a trial, then their verdict should be for the relator.

6. If the jury believe from the evidence that the relator, owing to the lack of specifications in his summons to the board, was not afforded sufficient opportunity at the hearing to defend himself fully and fairly, by summoning witnesses or otherwise, then their verdict should be for the relator.

7. If the jury believe from the evidence that the relator was led to believe by the board of governors at the hearing that he would be summoned again before the board to complete his defense, but was not so summoned by them and had no further opportunity to defend himself, then their verdict should be for the relator.

8. If the jury believe from the evidence that the relator, at the hearing of the board on April 25th, asked to be confronted with his accusers, and that such request was refused by the board, then their verdict should be for the relator.

9. If the jury believe from the evidence that the relator was also charged with conduct on previous occasions bringing great discredit on the club, as set out by the resolutions of April 25th, and if the jury believe from the evidence that the relator had no opportunity to defend himself against such charges, then their verdict should be for the relator.

10. If the jury believe from the evidence that the relator was not summoned before the meeting of May 2d, at which meeting he was expelled, and was not present at said meeting or notified of the same, then their verdict should be for the relator.

The further material facts are stated in the opinion of the court.—REPORTER.

*Mr. Walter V. R. Berry* for the appellant:

1. The law is well settled that in every proceeding before a club, having for its object the expulsion of a member, the latter is entitled to be fairly and fully heard and to have full opportunity of explaining his conduct.   *Mandamus* is the proper remedy to restore a member who has been wrongfully expelled.   1 Morawetz on Corporations, Sec. 277; Angel and Ames on Corporations, p. 469 ; Wilcock on Corporations, Sec. 700; 1 Spelling on Private Corp., Sec. 528; Merrill on Mandamus, p. 207; *Hutchinson* v. *Lawrence,* 67 How. Pr. (N. Y.), 38; *Plank Road* v. *Hixon,* 5 Ind. 169; *Rex* v. *Liverpool,* 2 Burr. 734; *Gebhard* v. *Club,* 21 Abbott's New Cases, p. 250; *Elliott* v. *Cotton Ex.,* 8 Hun, 216, 220; *Delacy* v. *Neuse,* 1 Hawks (N. C.), 281; *People* v. *Aid So.,* 22 Mich. 86, 90; *Erd* v. *Bavarian Assn.,* 67 Mich. 233, 236 ; *Newman* v. *Sailors' Snug Harbor,* 5 Abb. Pr. (N. S.), p. 123 ; *Com.* v. *Pa. Ben. Ins.,* 2 Ser. & Rawle, 141; Field on Corp., Sec. 65; *People* v. *Medical Society,* 24 Barb. 574; *Schmitt* v. *St. Franciscus So.,* 24 How. Pr. 216, 221; *Graham* v. *Chamber of Commerce,* 22 Wis. 68; *Medical Society* v. *Weatherly,* 75 Ala., p. 248; *Bartlett* v. *County of Erie,* 32 N. Y. 187; *Exeter* v. *Glide,* 4 Mod. 33, 37; *Dean* v. *Bennett,* Law Rep., 6 Ch. App. Cases, 489, 493; *Reg.* v. *Bailiff of Ipswich,* 2 Salk. 434–5; *Downing* v. *Society,* 10 Daly, 264; *Reg.* v. *Arch of Canterbury,* 1 Ellis & Ellis, 545, 560; *Rex* v. *Univ. of Cambridge,* 2 Lord Raym. 1334; *Innes* v. *Wylie,* 1 Car. & K. 257; *Blisset* v. *Daniel,* 10 Hare, 493; *Queen* v. *Saddler's Co.,* 10 H. L. Cases, 438, 456, 471; *Willis* v. *Childe,* 13 Beavans, 127, 130–2; *Loubat* v. *Union Club,* 40 Hun, 550.

From the principles of law illustrated in the cases cited above it is manifest that, before a member can be expelled from a club, he is entitled to be fully and fairly heard and given an opportunity to exculpate himself, as far as may be done, either in vindication or in palliation of the alleged misconduct; that no matter how desperate his case may ap-

pear, the board can not forestall him by saying he can allege nothing, but must hear the whole case before deciding it; that the materials on which judgment is formed must be accurately ascertained, and not upon hurried and incomplete examination; that the accused is entitled to claim that nothing important shall be disregarded to his prejudice. Wherever one looks in the range of law one finds that courts are loath to have parties deprived of their rights without full opportunity for defence; furthermore, that it would be doing monstrous injury to listen to half of what a man has to say, and then close his mouth to what may be the vital part of his statement. 1 Ev. Pothier, Sec. 799; *Randle* v. *Blackburn*, 5 Taunt. 245, 246; *Thompson* v. *Austen*, 2 Dowling & Ryl, 358; 1 Greenleaf on Evidence, Sec. 218.

It is said in the case of *Rex* v. *Sutton*, 10 Mod. 76, that "a removal being an act of an odious nature, all acts concerning it must receive a strict interpretation." If interpretation, not strict, but of the most favorable kind be given to the acts of the board of governors, it is apparent from their own testimony that from the beginning to the end the relator was deprived of his right to a fair hearing. He was, in fact, prejudged.

2. The great argument of the counsel below was that the relator had "admitted the charge," and that, therefore, the board had had everything before them on which to base a judgment. The relator never did admit the charge, but denied that he had been guilty of conduct unbecoming a gentleman, or that he had made a scandalous charge, or that he had accused the person of writing anonymous letters, but stated he had simply asserted the fact "when it was incumbent upon him to do so," and when he attempted to explain his conduct in regard thereto (as he could have done with honor to himself), he was interrupted, stopped, and shown the door.

3. By this act of expulsion the board disfranchised the relator and deprived him of valuable property rights, for

this club is a corporation possessing estate, real and personal, to the value probably of two hundred thousand dollars. There is an important distinction between cases of simple expulsion from the enjoyment of merely personal privileges of membership and those where such expulsion has the effect of forfeiting property interests. In the latter class of cases, courts will scrutinize the proceedings much more closely and more readily interfere to protect those interests and redress wrongs thereto. See Spelling on Corp., Sec. 531, and *Evans* v. *Philadelphia Club*, 50 Pa. St. 113. This is obvious, for the rights of such membership can not depend upon an arbitrary edict born of caprice, passion, or prejudice on the part of governors.

By this act of expulsion, in violation of every principle of justice, the board not only disfranchised the relator and deprived him of these valuable property rights, but also practically ruined his reputation.

*Mr. Calderon Carlisle* and *Mr. William G. Johnson* for the appellee:

1. The power of the appellee to expel the appellant by proceedings in conformity with its by-laws would seem to be not open to question in view of his contract of membership. That contract, as shown by the by-laws under which he became a member, conferred no absolute right to remain a member under any and all circumstances, but was expressly conditional in its character. He became a member only upon condition of his "assent to the constitution and rules" and of "submission to the restrictions they enjoin, and to the penalties which they impose."

The position now assumed by the appellant is, that notwithstanding this conditional contract of membership under which he was admitted, he has an absolute and unconditional right to remain in the club, to ignore all the restrictions enjoined by its rules and to escape all the penalties which they impose. The law will not permit him to

maintain so extraordinary and unreasonable a position. On the contrary, in cases calling for the action of the courts, the adjudications have been against appellant's position, and the right of a club to expel a member by its own proceedings in accordance with by-laws to which he has given his express or implied assent has been upheld.

One of the essential incidents of a corporation is to make by-laws for the management of its business and the control of its members. 1 Bl. Com. 475, 476; 2 Kent's Com. 297. In addition to this general incidental power there is express statutory authority by Section 546 of the Revised Statutes of the United States relating to this District which in enumerating the powers of corporations created under the act, in terms says: "and may make by-laws." A by-law which enjoins decorous conduct on the part of its members and denounces conduct " unbecoming a gentleman " is, in the strictest sense, germane to " the promotion of social intercourse," and not only properly within the power to make by-laws, but essential to the purposes and even continued existence of the corporation.

The doctrine of Lord Mansfield, as announced in *King* v. *Richardson*, 1 Burr. 517, 524, is declared by Chancellor Kent, in his commentaries, to be the modern law of corporations, and he says: "The power of amotion or disfranchisement of a member for a reasonable cause is a power necessarily incident to every corporation." 2 Kent's Com. 297. This doctrine was affirmed by Ch. J. Tilghman in 1810. *Com.* v. *Ben. Soc.*, 2 Binn. 448, 449. See also, to the same effect, *State* v. *Med. Soc.*, 38 Ga. 627; *Thatcher* v. *Com. Soc.*, 18 Abb. Pr. R. 278; *Dickenson* v. *Chamber of Com.*, 29 Wisc. 45; *Gebhard* v. *Club*, 21 Abb. N. C. 248; *Baum* v. *Cotton Exch.*, Id. 253.

In *Manning* v. *San Antonio Club*, 63 Texas, 169, 171, the court points out the distinction as to social clubs, and holds that a party can not invoke the protection of the courts against his own agreement by which he has assented to the by-laws. The respondent had full legal authority to expel

the relator. If considered as a member, by contract, by virtue of the express terms of that contract. If considered as a corporation, then under a valid by-law and an inherent and incidental power in the corporation by virtue of its corporate character.

2. The ground of the expulsion of the relator being the violation of a by-law made for the good government of the corporation, and being an act against his duty to the corporation, the respondent not only had the legal power to adjudge what constituted conduct unbecoming a gentleman, but it was the only tribunal which could exercise such a power. *King* v. *Richardson*, 1 Burr. 527; *Com.* v. *St. Patrick Ben. Soc.*, 2 Binn. 448; *Com.* v. *Union League Club*, 135 Pa. St. 301; *Dawkins* v. *Autrobus*, 17 Ch. D. 615; *Com.* v. *Pike Co. Ben. Soc.*, 8 W. & S. 247; *Benson* v. *Ben. Asso.*, 76 Texas, 562; *Hopkins* v. *Marquis of Exeter*, L. R. 5 Eq. 63; *Richardson* v. *Freemantle*, 24 L. T. 81; *Lambert* v. *Addison*, 46 L. T. 25.

This has been the uniform ruling of all courts. They do not assume to try questions which the corporations have the power to regulate by their by-laws, but merely to see that the by-law is valid and the proceedings under it in accordance with the by-laws, and that the party complaining had a fair opportunity to be heard.

3. The board of governors had an undoubted right to act upon the relator's plea of guilty without other evidence. Whether the relator did or did not admit his guilt in this case was submitted to the jury—not only left to them, but they were to judge whether under the evidence the charge was communicated to him and he understood it, and, understanding it, he admitted it. The jury found against him, and for the purposes of this case it must be held that he did understandingly admit the charge against him.

4. The burden being on the relator to show that he had not had a fair trial, the court could not assume, as matter of law, in the absence of any evidence as to what, if anything, the relator attempted or desired to present to the board, that

he had the legal right to have it considered against his admission of guilt.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The Metropolitan Club of the City of Washington was incorporated in 1882, under the general incorporation law for the District of Columbia, "for literary purposes, mutual improvement, and the promotion of social intercourse." By the law authorizing the incorporation, the corporators were authorized " to make by-laws and elect officers and agents, and to take, receive, hold and convey real and personal estate necessary for the purposes of the society as stated in their certificate, and other real and personal property, the clear annual income from which shall not exceed in value $25,000."

In the by-laws adopted, by Article IV, it is declared that " payment of the dues shall thereupon be deemed evidence of assent to the constitution and rules, as well as of submission to the restrictions they enjoin, and to the penalties which they impose. After payment of dues the membership shall in each case date from the day of election." And by Article V it is declared that, " Any member wilfully infringing the rules and regulations of the club, or *conducting himself in a manner unbecoming a gentleman, shall be subject to expulsion upon a vote of two-thirds of the members of the board of governors.*" This board of governors consisted of fifteen members.

In the bill of exception all the evidence *in extenso*, and the running debate of counsel in the progress of the trial, are set out in full; and the case is presented here, both in the brief and in the oral argument, as if this court was required to pass upon both the law and the facts of the case, wholly irrespective of the verdict of the jury. Whereas we can pass upon nothing except questions of law that were raised by the rulings of the court below and excepted to by

the appellant. If there was evidence to be considered, and the case was properly submitted to the jury on the instructions of the court, we have nothing to do with the inferences deduced from the evidence, or as to the conclusions of fact.

The verdict of the jury must be taken as conclusive as to all matters of fact involved in the trial. This is what is contemplated by Stat. 9 Anne, Ch. 20, Sec. 2, in force in this District, and according to which this trial was had.

From the evidence set out, in the bill of exception, it appears that the relator, Agustin de Yturbide, a citizen of the Republic of Mexico, was elected a member of the Metropolitan Club in January, 1887, and that he remained a member until the 2d of May, 1896. On this last mentioned day he was, by resolution of the board of governors, expelled from the association, and it is of that act that he complains.

It is shown that on the 23d of April, 1896, the following notification was given the relator, and which is admitted to have been received by him:

"Mr. Agustin De Yturbide.

Dear Sir: By order of the board of governors, I hereby give you notice that serious charges are preferred against you by members of the Club of conduct unbecoming a gentleman, which will be heard by the board on Saturday, April 25, at 2 o'clock, P. M., when you are notified to be present, if you wish to be heard in respect thereto.

" Very respectfully,

" Arnold Hague, *Secretary."*

The relator accordingly appeared before the board of governors on the 25th of April, as designated in the previous notice of the 23d of that month. Upon that occasion the relator was informed by the president of the board of governors of the nature of the charges made against him. He was informed in these terms: "Mr. Yturbide, you are charged with having made a scandalous charge against a lady, a daughter of a member of this club, within the club,

and to members of the club;" and the president of the board, naming a daughter of a member of the club, asked the relator, "If he had not accused her of writing anonymous letters?" To which question the relator replied: "No, Mr. President, the word 'accuse' does not convey the idea. At rare times, when I have felt it incumbent upon me to do so, I have asserted that she did, and I am prepared to prove the fact. I ask to be confronted with my accusers."

This was at once an admission of the main fact of accusation, and it seems to have been so regarded and acted upon by the board of governors. But the relator desired to go into a full statement of all the circumstances of the case, and his own conclusion as to his justification, and the exoneration of himself from blame. This, he contended, and still contends, was a right that was denied him, and hence he was wronged in not being allowed to make his defence Whether such right of defence was denied him, is the principal question involved in the case. He states that, "I was going to proceed with my justification, because I could not only have justified myself as to the charge, but I could have come out with honor in the matter of this anonymous letter affair, if I had only been heard. There was a great deal to say—in fact, there was everything to say—and I had said very little in the course of the few remarks I had been allowed to make." At that point, says the relator, he was directed to leave the room. The relator did leave the room, and shortly thereafter he received the following resolutions of the board of governors of the club:

"METROPOLITAN CLUB, April 25th, 1896.
"MR. AGUSTIN DE YTURBIDE.

"DEAR SIR: I beg to inform you that at a meeting of the board of governors, held Saturday, April 25th, the following resolutions were adopted:

"Whereas, Mr. Agustin de Yturbide has made a scandalous charge against the daughter of a member of the club,

within the precincts of the club, and to members of the club;

"*Resolved*, That, in the opinion of the board, he has been guilty of conduct unbecoming a gentleman; and

"Whereas, Mr. Yturbide, by his conduct on previous occasions, has brought great discredit on the club; be it

"*Resolved*, That, in the opinion of the board, he is no longer a desirable member of the club.

"*Resolved*, That Mr. Yturbide be furnished with a copy of these resolutions.

"Very respectfully,

"ARNOLD HAGUE, *Secretary*."

A copy of these resolutions was furnished the relator, but he utterly ignored them, and made no response thereto whatever. He says they called for no answer, and their contents were such as he considered unworthy of an answer from a gentleman. He says he was advised by a lawyer, and by many members of the club, to take no notice of them. These resolutions, as will be observed, were not resolutions of expulsion, but were simply declaratory of a desire on the part of the board of governors, that the club should be relieved of the membership of the relator, for the causes stated in the resolutions.

No attention having been given to these resolutions by the relator, the board of governors of the club, on the 2d of May, 1896, passed, and caused a copy thereof to be delivered to the relator, the following preamble and resolution :

"Whereas a copy of the resolutions passed at a meeting of the board of governors, held on Saturday, April the 25th, in the case of Agustin de Yturbide, was delivered to him on the same day, since which time he has made no response thereto; therefore,

"*Be it resolved*, That in accordance with the by-law of the club, said Yturbide be, and he is hereby, expelled from the club for conducting himself in a manner unbecoming a gentleman."

The relator himself, and several of the members of the board of governors, were examined at the trial as witnesses, and all gave their versions and recollections of what occurred upon the occasion when the relator was before the board on the 25th of April. The relator insists that he was not allowed, upon that occasion, a full and fair hearing for the vindication of himself; while on the part of the respondent, it is insisted that, the relator having distinctly admitted the fact that he had asserted in the club to members thereof that a daughter of a member of the club had been guilty of writing anonymous letters, there was no necessity for further inquiry, and that such conduct did not admit of any just excuse or palliation; and hence, after making the admission, the relator was refused a further hearing upon the subject.

It is somewhat remarkable, considering the nature of the case, and the fact of the admission made by him, that the relator has not stated, either in his petition for *mandamus*, or in his testimony, what the circumstances were that would justify his conduct, and acquit him with honor, as he asserts would have been the case, if he had been fully heard by the board of governors. The exculpatory or extenuating circumstances should have been stated, that the court or jury might have determined what effect they should have had upon the minds of the board of governors. It is not shown in any manner, whether the facts or circumstances that he was prevented from stating to the board of governors, were at all pertinent or material to his defence. To assume that they were so, could only be founded in mere conjecture.

At the close of the evidence on both sides, the relator moved the court for a direction to the jury that their verdict should be for the relator; but that request was refused and an exception was noted.

The court was clearly right in refusing this request. By that prayer, the relator was required to and did concede the truth of all the evidence against him, and to his right to relief, and all deductions from the evidence that could be

reasonably made, including the fact of good faith on the part of the board of governors, in arriving at their conclusion. With this concession made, the court could not have ruled otherwise than it did.

The relator, upon the refusal of the prayer for an instruction for a verdict in his favor, then offered ten prayers for instruction to the jury, some upon matters of fact, and others involving necessarily questions of law. All of these prayers concluded with a direction to find for the relator, if the fact referred to, and made the basis of the prayer, was found as the prayer assumed it might be found.

The court refused all of these prayers, and we think rightly so, as none of them contained an hypothesis, *as matter of fact*, that embraced the whole case, and excluded all adverse conclusions from the whole evidence. Most of them are based upon segregated facts, and are of an abstract form, while others proposed to submit to the jury propositions that necessarily involve the matters of law that control the whole case. These prayers will be inserted in the preliminary statement of the case by the Reporter; and we shall not prolong this opinion by incorporating them here. Before an instruction can be granted that concludes with a direction to find the verdict for the party offering the prayer, it must be clear to the court that such prayer includes, and requires the jury to consider, every fact and circumstance in evidence that might justify an adverse conclusion; and that, upon the whole evidence thus presented, the adverse party has no right to the verdict in his favor. Prayers that conclude to the right of the plaintiff to recover, or against his right to recover, must not be of an abstract form, or founded only on part of the evidence, but must be in a concrete form, and give full force and effect to every part of the evidence that is material, and may properly affect the result, whether produced by one side or the other. This principle was not observed in the formulation of the prayers offered by the relator.

11 Ct. App.—14

The relator excepted to the granting of an instruction at the instance of the respondent, and also to certain parts of the court's charge to the jury; and supposed errors in respect to these rulings are assigned. And whether there be error in these rulings we must inquire.

There is no longer any question of the right of a corporation, such as the respondent in this case, to make by-laws, even in the absence of express statutory power, and to exercise the power of amotion, as incident to the corporation. This has been regarded as the settled law since the case of *Lord Bruce*, 2 Strange, 819, and the subsequent exposition of the whole doctrine in the case of *Rex* v. *Richardson*, 1 Burr. 517, 539, by Lord Mansfield, speaking for the Court of King's Bench, in 1758. In this last mentioned case, after reviewing the former decisions and the previous doctrine upon the subject, and showing that the older cases had maintained a doctrine that had been modified by the more recent cases, the Lord Chief Justice said : " We all think this modern opinion is right. It is *necessary* to the good order and government of corporate bodies, that there should be such a power (that of amotion), as much as the power to make by-laws. Lord Coke says (*Bagg's Case*, 11 Co. 98a), 'there is a tacit condition annexed to the franchise which, if he breaks, he may be disfranchised. But where the offense is merely against his duty as a corporator, he can only be tried for it by the corporation. Unless the power is *incident*, franchises or offices might be forfeited for offences, and yet there would be no means to carry the law into execution. Suppose a by-law made to give power of amotion for just cause, such by-law would be good. If so, a corporation, by virtue of an incidental power, may raise to themselves authority to remove for just cause, though not expressly given by charter or prescription." The doctrine of that celebrated case has never been questioned from the time it was announced, and it is the law, both in England and in this country, at the

present day.   *Com.* v. *St. Patrick Ben. Soc.*, 2 Binn. 448, 449; 2 Kent. Com. 297.

As said by Chief Justice Tilghman, in *Com.* v. *St. Patrick Ben. Soc.*, *supra*, "Every incorporation possesses inherently the power of expulsion in certain cases, because such power is necessary to the good order and government of corporate bodies.   There is a tacit condition annexed to the franchise of a member, which, if he breaks, he may be disfranchised. The cases in which this inherent power may be exercised are of three kinds;" and the second of which is, that "when the offence is against his duty as a corporator, in that case he may be expelled on trial and conviction by the corporation."

In this case, the statute authorizing the incorporation of the club authorizes the making of by-laws; and, by the by-laws made, the becoming a member requires the party to agree, as a condition, that he will submit to the rules and restrictions prescribed; and by one of the by-laws it is declared that any member conducting himself in a manner unbecoming a gentleman shall be subject to expulsion upon a vote of two-thirds of the members of the board of governors. There is, therefore, no want of authority for the expulsion of a member of the club for the offence designated in the by-law.   And as the offence with which the relator was charged was one against his corporate duty as a member of the club, he could only be tried by the constituted corporate authorities, under the by-law; and if such trial was regularly conducted, and the judgment arrived at was in good faith, there is no power or jurisdiction in the courts to interfere with or reverse or vacate that judgment.   *Rex* v. *Richardson, supra; Com.* v. *St. Patrick Ben. Soc., supra; Gregg* v. *Mass. Med. Soc.*, 111 Mass. 185; *Lambert* v. *Addison*, 46 L. T. 25.

First, then, as to the alleged insufficiency of notice to the relator, and the supposed want of form and solemnity in the manner of trial.   Putting aside mere technical formality, we think these objections are without reasonable foundation.

The relator was substantially and sufficiently notified of the accusation against him; and it was not necessary that there should have been a specification of the offence set out in the first notice served on him. The fact of his appearing before the board on the 25th of April, when he was fully informed of the specific nature and character of the charge, would seem to remove all ground for the alleged surprise. He was not only fully informed of the nature of the charge, but he recognized and admitted the fact of which the charge was predicated. He was not expelled until several days afterwards. The admonitory resolutions of the 25th of April, 1896, passed prior to his expulsion, he thought proper to disregard. And with respect to the supposed want of form and solemnity in the proceedings and judgment of the board of governors, we perceive no ground for the objection. The judgment was expressed in the form of a resolution, but it was clear and definite, and left no doubt as to the cause and foundation of the proceeding. It was upon the charge, and that only, of conducting himself in a manner unbecoming a gentleman, that the judgment was founded, and that was strictly within the terms of the by-law. Nothing more formal and technical was required. In the case of *Com.* v. *Union League Club*, 135 Penn. St. 301, there was a by-law of the club which gave the directors the power of expulsion "for acts or conduct which they might deem disorderly or injurious to the interest, or hostile to the objects of the club;" and it was held not to be essential to the validity of a conviction upon such charge, that there be a finding by the tribunal trying the offence, *in totidem verbis*; but it was sufficient if a resolution was passed, that the member was guilty of a violation of the by-law, based upon the fact that, without provocation, he had charged a fellow member in the club-house of acting like a blackguard.

Whether the conduct of the relator in accusing the lady a daughter of a member of the club, within the club, to members thereof, of writing anonymous letters, was such

as made it unbecoming a gentleman, within the meaning of the by-law, was a question, as we have seen upon the authorities already cited, that could only be determined by the corporate authorities; and that it is only where it is made clearly to appear that such determination was *ultra vires,* or made contrary to good faith, that the courts can interfere· The courts can not sit as appellate tribunals to review the judgments of the corporate authorities in such cases.    The parties concerned having constituted their own domestic tribunal for the trial and determination of questions of alleged violation of purely corporate duty, they must abide such determination, unless the authority be transcended, or there be fraud or bad faith shown.

In the case of *Gardner* v. *Freemantle,* 19 W. Rep. 256, before Lord Romilly, Master of the Rolls, that learned judge said: " I point out that these clubs are formed entirely for social purposes, and there must be some paramount authority to keep up their objects.    In some cases the court will interfere with the exercise of that paramount authority, but only where there is moral culpability, or if the decisions arrived at are from fraud, personal hostility, or bias; but in cases of this description all that this court requires to know is, that the persons who are summoned really exercised that judgment honestly.    The court will not decide whether they did rightly or wrongly in making their decision."

The leading case in England, and which is recognized as controlling authority, is that of *Dawkins* v. *Autrobus,* 17 Chan. Div. 615.    That case was, in the first instance, decided by Jessel, Master of the Rolls, and whose judgment upon appeal was unanimously affirmed by the Court of Appeal, consisting of Lord Justices James, Brett and Cotton.    The case was most thoroughly discussed by the Master of the Rolls, and also by the Lord Justices on Appeal.

In that case it was held, that the court would not interfere against the decision of the members of a club, professing to act under their rules, unless it could be shown, either

that the rules were contrary to natural justice, or that what was done was contrary to the rules, or that there had been *mala fides* in arriving at the decision.   And it was also held, that a rule providing for the expulsion of a member, who should be guilty of conduct injurious to the interest of the club, was within the powers of regulation, and could be validly passed by a general meeting of the corporation. That is to say, that the power of expulsion was within the power of making by-laws for the government of the corporation.

In disposing of the case on appeal, just referred to, Lord Justice Brett said : " In my opinion there is some danger that the courts will undertake to act as courts of appeal against the decisions of members of the club, whereas the court has no right or authority whatever to sit in appeal upon them at all.   The only question which a court can properly consider is, whether the members of the club, under the circumstances, have acted *ultra vires* or not, and it seems to me the only questions which a court can properly entertain for that purpose are, whether anything has been done which is contrary to natural justice, although it is within the rules of the club—in other words, whether the rules of the club are contrary to natural justice.   Secondly, whether a person who has not condoned the departure from the rules has been acted against contrary to the rules of the club; and thirdly, whether the decision of the club has been come to *bona fide* or not.   Unless one of those charges can be made out by those who come before the court, the court has no power to interfere with what has been done. This court has no right, in my opinion, to consider whether what has been done was right or not, or, even as a substantive question, whether what was decided was reasonable or not.   The only question is, whether it was done *bona fide*."

Lord Justice Cotton said : " We are not here to sit as a court of appeal from the decision of the committee or of the general meeting.   We are not here to say whether we should

have arrived at such a conclusion or not, and the question whether the decision was erroneous or not can only be taken into consideration in determining whether that decision is so absurd or evidently wrong as to afford evidence that the action was not *bona fide,* but was malicious or capricious, or proceeded from something other than a fair and an honest exercise of the power given by the rule or by-law."

In deducing a conclusion from the cases, as to the power of the courts to interfere, Mr. Leach, in his Club Cases, page 47, says: "Clubs are essentially social institutions, and other objects are merely secondary and adventitious. Gentlemanly conduct and good feeling between the members are necessary for the maintenance and prosperity of the club, as a social institution; there must be some paramount authority to take note of any ungentlemanly behavior or breach of good feeling of the club, and that authority is usually vested in a committee. It is their duty, as well as their own and the club's interest, to inquire into any alleged offence against club morals, and, if need be, to take the initiative in instituting such inquiry. But the penalties on the convicted offender are so serious that it behooves them to act in a manner befitting what they are—a judicial or quasi-judicial body—and, in consequence, they should in such matters act strictly in accordance with the rules of the club, and the ordinary principles of justice; and they should pay particular attention to the constitution of the court, by seeing that due notices are sent to all the persons who ought to be summoned, whether as committeemen, witnesses or accused; and that no one who has any bias or personal interest in the matter in question should sit as a member of the tribunal on the inquiry; the accused person should be given full opportunity of defending himself; and finally, the decision should be arrived at in a *bona fide* manner, on the circumstances in evidence, without malice and without caprice. If any of these considerations can be shown to have been disregarded, then a judicial tribunal will inter-

fere, and the decision of the quasi-judicial tribunal will be set aside."

By the instruction granted at the instance of the respondent, taken in connection with the general charge by the court, the question would seem to have been fully and fairly submitted to the finding of the jury, and their finding is conclusive upon the subject of the fairness and *bona fides* of the trial by the board of governors.  The jury were instructed that if they believed that the relator was, when before the board of governors, on the 25th of April, 1896, "then informed that the charge against him was that he had made a scandalous charge against a lady, a daughter of a member of the club, to members of the club, within the precincts of the club, in that he had charged such lady with writing anonymous letters, and that the relator then and there admitted that he had charged the lady in the club to members thereof with writing anonymous letters, then the board of governors were the exclusive judges of whether the facts so admitted constituted conduct unbecoming a gentleman, and the verdict should be for the respondent."  This instruction was given in connection with the further charge to the jury, "that if they should find that the relator admitted the fact, on the occasion referred to, of having accused the lady within the club, to members thereof, of having written anonymous letters, then their verdict should be for the respondent.  But if they should find that the relator did not admit the charge made against him, then the verdict should be for the relator."  And in the conclusion of the charge to the jury, the court said: "It is not a question of propriety as to whether this board of governors reached a correct conclusion upon such admission, if it were made.  We are not to criticise that action.  We are simply to enquire whether the relator had a fair opportunity on that occasion to understand the charge that was made against him, with its specifications, and whether, being so fairly informed, he admitted it."

D. C.]                                   Syllabus.

Though the discretion reposed in the board of governors should not, as we have seen, be capriciously or arbitrarily exercised, yet, until their determination is successfully impeached, that determination will be presumed to have been fairly and *bona fide* made. The law will not presume fraud or bad faith in the action of the board of governors. In other words, when a party comes into court for relief it is incumbent upon him to show the existence of facts to justify the interference of the court.

Here the verdict of the jury has negatived the existence of fraud or bad faith or want of fairness on the part of the board of governors in passing the resolution of expulsion; and there is, therefore, no ground for a *mandamus*, either to restore the relator to membership in the club, or to compel a retrial of the charge made against the relator. The judgment refusing the *mandamus* must therefore be affirmed; *and it is so ordered.*

*Judgment affirmed.*